**FIRST DEVELOPMENT CORPORATION OF KENTUCKY,**
Plaintiff–Appellee,

**Harmony Landing Development Company, Inc. (89–5136), Intervening Plaintiff–Appellant,**

v.

**MARTIN MARIETTA CORPORATION (89–5093), Defendant–Appellant.**

Nos. 89–5093, 89–5136.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 7, 1991.

Decided March 26, 1992.

Rehearing Denied April 29, 1992.

John R. McCall (argued and briefed), Thomas M. Quinn, Brown, Todd & Heyburn, Louisville, Ky., for plaintiff-appellee.

William P. Croley (argued and briefed), Brammel, Croley, Moore & Yates, LaGrange, Ky., for intervening plaintiff-appellant.

John G. Carroll (briefed), John K. Doll, Greenebaum, Boone, Treitz, Maggiolo, Reisz & Brown, Charles H. Zimmerman, Jr. (argued and briefed), Foley, Zimmerman & Bryant, Louisville, Ky., for defendant-appellant.

Before: NELSON, Circuit Judge; and BROWN and KRUPANSKY, Senior Circuit Judges.

PER CURIAM.

Appellants Martin Marietta Corporation (Martin Marietta) and Harmony Land Development Company (Harmony Land) have appealed from a judgment of the district court in this diversity case permanently enjoining Martin Marietta from selling a 15–acre parcel of riverfront real property to Harmony Land and ordering Martin Marietta to convey the said parcel to First Development Corporation of Kentucky (FDCK), the plaintiff below.

On May 9, 1988, Martin Marietta entered into a 365–day exclusive listing agreement with Coldwell Banker, a real estate brokerage firm, to sell the property here in controversy for $750,000. Coldwell Banker designated Don Gilmour (Gilmour) as its account agent.

On August 16, 1988, FDCK, through its president Sam Pollitt (Pollitt), a sophis-

ticated real estate broker and developer, submitted an offer to purchase the parcel for $300,000. The offer was submitted on a standard Louisville Board of Realtors form, and interlineated the following open-ended conditions:

1. obtaining a loan satisfactory to the purchaser;
2. obtaining a satisfactory survey;
3. obtaining required zoning changes;
4. obtaining on-site sewage disposal;
5. obtaining required building permits; and
6. obtaining hazardous waste and surface soil waivers.

The FDCK offer required:

These contingencies must be satisfied or waived within 180 days from acceptance of this contract. Closing to be within 45 days from removal or waiver of these contingencies.

The offer to purchase was accompanied by an earnest money deposit evidenced by a $1,000 check payable to Coldwell Banker. The deposit was fully refundable if transfer of title to FDCK was not completed for any reason except FDCK's failure to perform, as distinguished from a nonrefundable payment to a seller as consideration for an option to purchase realty within a specified period. The check was not negotiated and ultimately returned to FDCK on or about September 26 or 27 of 1988.

The offer to purchase was to expire on August 24, 1988 at 6:00 o'clock p.m.

FDCK's proposal was essentially a 7½-month free option to purchase the 15 acres of land, during which period Martin Marietta was foreclosed from disposing of the property to any other interested buyer. Both the purchase price and satisfaction of the open-ended conditions incorporated into the offer to purchase were contingent upon FDCK's unilateral approval and satisfaction and were totally unacceptable to Martin Marietta, and it permitted the offer to expire without response.

Immediately subsequent to the expiration of FDCK's offer to purchase, Pollitt prevailed upon Gilmour to seek a counteroffer from Martin Marietta.

In an effort to accommodate Pollitt, Gilmour persuaded Martin Marietta to reconsider the sale price of the land.

In a letter dated September 7, 1988 addressed to Gilmour, Martin Marietta agreed to sell the acreage on the following unconditional terms:

1. purchase price—$550,000 cash;
2. earnest money—$20,000;
3. Martin Marietta to retain the option of closing the sale during December 1988 or January 1989; and
4. the counteroffer to remain open for thirty days from September 7, 1988.

Upon receipt of the letter on September 7, Gilmour immediately communicated its contents to Pollitt by telephone. Pollitt received a copy of the letter from Gilmour on or about September 12, 1988. He initiated no further inquiries or action concerning the property until September 20, 1988 when Gilmour advised him that negotiations for the sale of the property to Harmony Landing were about to be concluded.

Harmony Landing had initiated the purchase of the property directly with Paxton Badham, in-house legal counsel for Martin Marietta in Raleigh, North Carolina, within days of FDCK's expired offer. Bill Harvey (Harvey), president of Harmony Landing, owned and was developing a 5-acre parcel of real property contiguous to Martin Marietta's land as a private marina and yacht club. Harvey, through a series of telephone conversations with Badham, had agreed to pay Martin Marietta a nonrefundable consideration of $10,000 for an initial 60-day option to purchase the property. During this period, he intended to obtain permits from the Oldham County Planning and Zoning Commission to deposit excavation fill from his marina upon the Martin Marietta land. Upon obtaining the permits, Harvey would pay Martin Marietta an additional nonrefundable $40,000 as consideration for an additional ten-month extension of the option. Harmony Landing had 12 months from the original date of the option within which to purchase the property for an additional $500,000. Upon the exercise of the option to purchase the land, the $50,000 advanced as consideration for

the options would be applied to the sale price of $550,000.00.

Badham drafted a contract incorporating the terms of the agreement. An executed copy was delivered to Harvey by Federal Express on Monday, September 19, 1988. Upon receipt of the executed contract, Harvey telephoned Badham, who approved various suggested insignificant modifications of the agreement. Harvey executed the amended contract, attached a check for $10,000 and mailed it to Badham by overnight Federal Express on either September 21 or 22. Badham received the executed contract and the $10,000 on or about September 22 or 23, 1988.[1]

On September 21, Gilmour, who was not current with the fast-track negotiations between Harvey and Badham, advised Pollitt of Harvey's interest in acquiring the Martin Marietta land. Pollitt remained noncommittal concerning the negotiations and communicated no further interest in the property during that telephone conversation. Pollitt testified that after talking with Gilmour on September 21, he visited the 15–acre Martin Marietta riverfront property at 4:00 p.m. with his partner Dike Gregory and their engineer Phil Bills of Sayback and Wilson Consulting Engineers. During the meeting, according to Pollitt, he, Bills and Gregory walked the property and discussed various studies that had been conducted and arrived at a decision to accept the September 7, 1988 offer from Martin Marietta.

Pollitt testified further that he did not convey FDCK's decision to accept Martin Marietta's offer of September 7 to Gilmour after the meeting. He testified that after the meeting on the riverfront site, he returned to his office and immediately consulted his attorneys, Brown, Todd and Heyburn, *"regarding a contract for the acceptance of this offer [the Martin Marietta offer of September 7.]"* The discussion included the necessity for zoning changes, the acquisition of building permits, requirements for on-site septic systems, availability of water, electricity and all other utilities

that would be servicing the site—essentially, all of the conditions that had been incorporated into his expired original offer to purchase dated August 16.

He further indicated that, after concluding his conversation with his lawyers, he typed an acceptance on the bottom of the Martin Marietta letter of September 7, 1981 and signed it; that he *physically attached* the executed letter "acceptance" to the two-page form Louisville Board of Realtors standard purchase agreement dated 8/16/88, together with a check in the amount of $20,000 payable to Coldwell Banker. He inserted the documents into an envelope that he placed into his desk drawer. (Significantly, Pollitt did not include in the envelope a copy of the $1,000 check which had accompanied the offer that expired on August 24, 1988.) He made no effort to convey FDCK's acceptance to Gilmour. Pollitt further testified that on the morning of September 22, he placed the envelope and its contents into his Executive Office Suite's mail depository for meter stamping and delivery to the U.S. Postal Service pickup which occurred between 4:30 and 5:15 p.m. each day. Again, he made no effort to advise Gilmour of his purported acceptance.

As previously indicated, he returned a Gilmour telephone call at 2:30 p.m. on September 22, during which time the following material colloquy occurred:

> Q. Would you refer then to your notes and tell us what his [Gilmour's] precise words were to you?
>
> (Witness refers to his notes.)
>
> A. 9/22/88, I returned Don's call. Don Gilmour said that Martin–Marietta *had accepted an option on the river property.*
>
> Q. And in your notes, is that in quotes?
>
> A. Yes sir.

II *J.App.* at 57.

After Gilmour had advised Pollitt that Martin Marietta had executed an option to sell the property to Harmony Landing, Pollitt responded:

---

1. Verbatim, conformed, clean copies were reexecuted on September 23, 1988 and thereafter

exchanged between Harvey and Martin Marietta.

A. Don, we've got a problem. First Development Corporation has already accepted the counter offer, which was given to them by Martin–Marietta;

Q. That is, did you tell him at that point in time that you had accepted the contract?

A. Yes sir.

Q. At that point in time, had you delivered to him a $20,000 check?

A. No sir.

Q. Had you delivered to him a contract of any kind that had been ...

Q. Had you conveyed that to him personally? Had you delivered it to him?

A. No.

Q. Had you delivered to him the $20,000 check?

A. No, but ...

Q. It's your testimony you had not put it in the mail at that point in time, is that correct?

A. My—are you talking about the U.S. mail?

Q. Yes sir.

A. No sir.

II *J.App.* at 55.

Under Kentucky law, an offer must be accepted "before any *intimation* is received that offer is withdrawn," *Shaw v. Ingram–Day Lumber Co.*, 152 Ky. 329, 335, 153 S.W. 431, 434 (1913) (emphasis added); express notice or use of the word "revoke" is not necessary to revoke an offer. An offer is revoked when the offeree learns of acts by the offeror that are inconsistent with the continuance of the offer or that imply that the offer has been revoked. *Ingram, supra. See also Restatement (Second) of Contracts §§ 42 & 43 (1979); 1 S. Williston, A Treatise on the Law of Contracts § 57 (3rd ed. 1957).* It is obvious from the context of Pollitt's testimony in relating the above conversation, coupled with his conversation with Gilmour on September 21, that Pollitt knew that the *"accepted"* option agreement between Martin Marietta and Harmony Land was an *option to purchase* the riverfront land.

He knew that the land was no longer available and off the market.

Pollitt went on to testify that he advised Gilmour that he would personally deliver FDCK's "acceptance" and check to him with the understanding that it would be forwarded to Martin Marietta for review. Pollitt testified that, at the conclusion of the telephone conversation, he retrieved the unmetered envelope containing his "acceptance" from his office's mail drop and delivered it to Gilmour. Gilmour noted the time of delivery on the face of the envelope and its contents as 4:15 p.m. The envelope and its contents, including the check for $20,000 was returned to Pollitt on or about September 26 or 27. He thereafter initiated the instant action for temporary and permanent injunction and specific performance.

To avoid any credibility assessments which may have been assigned by the trial court in arriving at its decision, this court's resolutions of charged errors are confined to considerations of the undisputed facts and testimony of Pollitt developed during the trial as impacted by Kentucky law.

Recognizing that FDCK's initial conditional offer to purchase the riverfront property expired on August 24, 1988, the district court nevertheless concluded that the refundable earnest money evidenced by the $1,000 check, payable to and in the possession of Coldwell Banker during the period of this controversy, was, by operation of law, converted into consideration for a 30–day irrevocable option in favor of FDCK to purchase the riverfront property in accordance with the terms of Martin Marietta's letter of September 7, 1988.

The district court's decision is properly judged against Kentucky law, which is in accord with existing precedent prevailing throughout the states.

In Kentucky, "It is well settled that an option [to purchase real property] is not binding as a contract where there is no consideration unless it is accepted within the time limit and before the offer is with-

drawn." [2] *Combs v. Turner,* 304 Ky. 179, 200 S.W.2d 288 (1947); *Noble v. Mann,* 32 Ky.L.Rptr. 30, 105 S.W. 152 (1907).

Initially, this court must determine if the Martin Marietta letter of September 7, 1988 and FDCK's purported acceptance constituted an irrevocable option supported by consideration to purchase the riverfront property within thirty days from September 7. The answer is contingent upon the legal significance of FDCK's refundable $1,000 earnest money evidenced by the check payable to Coldwell Banker which was attached to FDCK's initial offer of 8/16/88 to purchase the Martin Marietta property.

■ Neither the plaintiffs' complaint nor Pollitt's testimony disclosed an affirmative allegation that the $1,000 check, which accompanied the August 16, 1988 original offer to purchase, was consideration for an irrevocable 30–day option to accept Martin Marietta's offer of September 7, 1988. Neither FDCK nor Pollitt have affirmatively asserted that they had negotiated or paid for an irrevocable 30–day option to accept Martin Marietta's offer to sell dated September 7, 1988. None of the relevant documents exchanged between Martin Marietta and FDCK, including both the initial offer to purchase the riverfront property which expired on August 24, 1988 or the subsequent purported acceptance of Martin Marietta's offer to sell dated September 7, 1988, reflected an intention on behalf of either party to negotiate an irrevocable option to sell or purchase the riverfront property for a nonrefundable consideration in any amount. The documentation is explicitly clear that the parties, all of whom were sophisticated businessmen experienced in brokering real estate, were negotiating for an unconditional sale rather than an option agreement. Martin Marietta's initial offer to sell dated May 9, 1988 and its subsequent offer to sell dated September 7, 1988 solicited unconditional offers to buy. The record testimony fails to disclose that the parties or their representatives ever dis-

cussed an irrevocable option to purchase the property supported by valid consideration as an alternative to an outright sale. Pollitt himself considered FDCK's initial offer to purchase, which expired on August 24, 1988, and FDCK's purported acceptance of the September 7, 1988 offer to sell as two independent transactions. He testified that:

Q. And it's your testimony, is it not, Mr. Pollitt, that all of the checks which you have tendered at any time to Martin–Marietta have been returned to you and none of them were ever negotiated?

A. My testimony is that we tendered a thousand dollar deposit check on— with the original contract of around the 16th or 17th of August, and we tendered another deposit check with the acceptance of the counter offer on September the 22nd. They were accepted by Don Gilmour as agent for Martin–Marietta. (Both checks were subsequently returned.)

II *J.App.* at 51.

In *Ford v. McGregor,* 314 Ky. 116, 234 S.W.2d 493 (1950), the high court of Kentucky concluded that an "option" without consideration can be withdrawn at any time before acceptance and that *a refundable deposit which is simply an advance payment on the purchase price, if the sale of the real estate is ultimately consummated, does not constitute consideration for an irrevocable option.*

We think it is clear that there was no monetary consideration to support the option contract here involved. There was no money paid *for the option itself.* The $650.00 check was simply an advance payment on the purchase price if the deal went through but, if not, to be refunded.

*See New Headley Tobacco Warehouse Co. v. Gentry's Ex'r,* 307 Ky. 857, 860, 212 S.W.2d 325, 326 (1948); *Allen R. Krauss Co. v. Fox,* 132 Ariz. 125, 644 P.2d 279

---

**2.** An "option" without consideration is not in the strict sense an irrevocable contract to sell within a specified time. An offer to sell real estate within a specified time, unsupported by

consideration, is merely an agreement to sell the property during the designated time and may be withdrawn at any time within the time limit.

(Ariz.Ct.App.1982); *Torlai v. Lee*, 270 Cal. App.2d 854, 858, 76 Cal.Rptr. 239, 242 (Cal. Ct.App.1969); *Restatement (Second) of Contracts* § 42, illus. 1; *see also Stamper v. Combs*, 164 Ky. 733, 736, 176 S.W. 178, 180 (1915); 1 S. Williston, *A Treatise on the Law of Contracts* § 55 (3d ed. 1957). The district court's effort to distinguish *Ford* from the case at bar is not persuasive.[3]

In light of the foregoing, it is the decision of this court that the $1,000 refundable earnest money evidenced by a check which accompanied FDCK's original offer to purchase the riverfront property that expired on August 24, 1988, did not, within the pronouncements of existing Kentucky law, constitute "consideration" for a 30–day irrevocable option to accept Martin Marietta's offer to sell its land dated September 7, 1988. The trial court's findings to the contrary are accordingly clearly erroneous and contrary to law.

Having concluded that FDCK did not have a 30–day irrevocable option within which to accept Martin Marietta's September 7 offer to sell the land in controversy, this court must decide if FDCK had, in fact and in law, accepted the Martin Marietta offer to sell its property before it, FDCK, knew that the land was no longer available and had been taken off the market.[4]

Here again, the assignment of error is resolved by Pollitt's testimony as it concerns his activities of September 21 and 22.

As previously noted, FDCK through Pollitt became aware of the executed irrevocable option of Harmony Land to purchase the riverfront property from his conversation with Gilmour at approximately 2:30 p.m. on September 22, 1988. To arrive at the contrary conclusion suggested by Pollitt, an experienced, knowledgeable real estate broker and developer, that the option agreement between Martin Marietta and Harmony Land was an agreement other than an option to purchase the riverfront land, especially within the context of the conversations that occurred between Gilmour and Pollitt on September 21 and 22 as testified to by Pollitt, defies common sense. Consequently, this court must decide if FDCK accepted the Martin Marietta offer to sell before 2:30 p.m. on September 22, 1988.

■ Kentucky law embraces the "mail box rule" as defined in the *Restatement (Second) of Contracts*, section 63(a), which provides that an acceptance of a contract becomes effective when it is *"put out of the offeree's possession."* Comment e to section 63(a) provides that "communication by means of the offeree's employee is excluded; the employee's possession is treat-

---

**3.** FDCK's initial offer to purchase the property here in controversy dated August 16, 1988 to which the $1,000 earnest money check was attached provided:

> As evidence of good faith binding this contract, a deposit of $1,000.00 is made herein to be held by Coldwell Banker and to be applied on the purchase price upon passing deed or refunded if transfer of title is not completed for any reason, except BUYER'S failure to perform BUYER'S obligation hereunder ...

Appellant's Brief at 17.

The trial court's reasoning that FDCK's $1,000 refundable earnest money evidenced by its check, induced Martin Marietta to make its counteroffer of September 7, 1988 because Martin Marietta had "the unfettered power to negotiate" FDCK's earnest money check and that "Martin Marietta had access to the use of the funds," is unsupported by the record or Kentucky law. Initially, it should be noted that the check was payable to Coldwell Banker, the broker and escrow agent retained to sell the property. The check clearly noted on its face that it was tendered for the "Oldham Co. deposit [Oldham County land deposit]". It is obvious that Martin Marietta was not the payee and could not have negotiated the check. It is equally apparent that Coldwell Banker was, pursuant to Kentucky law, precluded from disposing of the funds represented by the check until the underlying transaction for which the check was issued had been either performed or terminated. Ky.Rev.Stat.Ann. § 324.111 (Banks–Baldwin 1991). FDCK's August 16 offer, together with the tendered $1,000 check, had expired on August 24, 1988, without acceptance. Coldwell Banker did not, thereafter, have the authority to negotiate the said check. The check, which had never been negotiated, remained in the possession of Gilmour until its return on or about September 26 or 27, 1988. *Guill v. Pugh*, 311 Ky. 90, 92, 223 S.W.2d 574, 575 (1949).

**4.** The effective date of the Harmony Land option is of only collateral consequence in resolving the effective date and time of FDCK's acceptance, if any, of the Martin Marietta offer to sell.

ed as that of the employer." *Restatement (Second) of Contracts* § 63(a) cmt. e. Simply stated, the Kentucky rule, adopting the pronouncements of the *Restatement*, in *United States v. Wadlington*, 333 S.W.2d 771, 773 (Ky.1960), provides that: "Ordinarily an offer may be accepted by mailing acceptance, *properly stamped and addressed.*"

In the instant case, Pollitt conceded that the envelope containing FDCK's acceptance was placed into the mail depository manned by his employees for stamp metering and delivery to the U.S. Postal Service.[5] The envelope, however, never left his possession or control as evidenced by his effortless retrieval of the documents from the office mail drop *after* he became aware of the option in favor of Harmony Land to purchase the property. At that point in time, the envelope had not been stamp metered. He thereafter hand-delivered the envelope and its contents to Gilmour, who accepted it at 4:15 p.m. on September 22. This was approximately one hour and forty-five minutes after he knew the property was off the market. Kentucky law provides that an offer must be accepted "before any *intimation* is received that offer is withdrawn," *Shaw v. Ingram–Day Lumber Co.*, 152 Ky. 329, 153 S.W. 431, 434 (1913) (emphasis added); express notice or use of the word "revoke" is not necessary to revoke an offer. An offer is revoked when the offeree learns of acts by the offeror that are inconsistent with the continuance of the offer or imply that the offer has been revoked. *Ingram, supra. See also Restatement (Second) of Contracts* §§ 42 & 43; 1 S. Williston, *A Treatise on the Law of Contracts* § 57 (3rd ed. 1957).

█ Accordingly, it is the considered opinion of this court that FDCK had not accepted Martin Marietta's offer to sell the riverfront property dated September 7, 1988 before it knew through Pollitt that the land was no longer available and had been taken off the market. The district court's contrary resolution is clearly erroneous both in fact and law.

Finally, this court must determine if the district court committed errors in fact and/or law in arriving at its decision that FDCK's "acceptance" of Martin Marietta's offer to sell dated September 7, 1988 was unequivocal and unconditional.

Pollitt's cautious approach to the purchase of the riverfront property was reflected throughout his negotiations for its acquisition. As an experienced and knowledgeable developer, he obviously did not intend to commit FDCK to the risks of an irrevocable expenditure of between $300,-000 and $500,000 without assurances that the land could be developed for its highest and best use. His anticipated land use required significant contingencies as reflected by the conditions incorporated into his first offer to purchase dated August 16 of 1988. That offer provided the following:

> Buyer's obligations under this proposal shall be contingent upon satisfaction or waiver by the buyers of the conditions precedent prior to closing for title, survey, any change in zoning that might be required, water, electricity, on sight sewage disposal, building permits being obtained, hazard wastes and surface soil conditions, which conditions precedent shall be in the form in content acceptable to buyers. These contingencies must be satisfied or waived within 180 days from acceptance of this contract, closing to be within 45 days from the removal or waiver of these contingencies.

Ex. P–4: Offer of Purchase dated August 16, 1988, at paragraph 12.

In determining if FDCK's acceptance of the September 7 offer was unconditional

---

**5.** Pollitt testified on cross-examination:

Q. These people to whom you had given this package, they were, in fact, employees of yours essentially, were they not? This is part of the service you paid for?
A. Yes.
Q. They were not postal employees, were they?
A. No sir.
Q. That was not a post office box?
A. No sir. There are post office boxes on the premises for incoming mail.
Q. But not for outgoing?
A. Not for outgoing, right.

and unequivocal, this court again finds resolution in Pollitt's testimony as developed within the context of this case.

To recapitulate, after conversing with Gilmour on September 21, Pollitt met with his consulting engineer on the riverfront site to discuss the development of the property in accordance with his projected plans. After the meeting, he returned to his office and immediately consulted with his lawyers Brown, Todd & Heyburn *"regarding a contract for the acceptance of this offer [the Martin Marietta offer of September 7.]"*

> Q. My notes indicate that you testified that you consulted with Brown Todd & Heyburn regarding a contract for the acceptance of this offer?
>
> A. What should go in the offer. In other words, terms and conditions of the contract, this contract right here, okay?
>
>     \*    \*    \*    \*    \*    \*
>
> Q. And includes the two-page standard Louisville Board of Realtors, Inc. sales and purchase contract?
>
> A. That's correct.
>
>     \*    \*    \*    \*    \*    \*
>
> Q. Did you consult with Brown Todd & Heyburn about the zoning of that property?
>
> A. That was one point, yes.
>
> Q. Do you know from your own knowledge or from what Mr. Bills said that Wilson or anyone else told you what's the present zoning of that property, Mr. Pollitt?
>
> A. I believe it's CO1.
>
> Q. CO1?
>
> A. Yes, or it's Conservation District.
>
> Q. It's a Conservation District, correct?
>
> A. Right.
>
> Q. And what does that mean?
>
> A. I'm not—a conservation district—I'll give you a layman's definition. A conservation district is a district where they are using as a conservatory.
>
> Q. Do you know that you can only build houses at a density of one house per acre in such a conservation district?
>
> A. I think that's true, yes.
>
> Q. And you want to build—you want to undertake a more intense development than one house per acre, correct?
>
> A. Yes.
>
> Q. And so part of the reason why you had Phil Bills out there and part of the reason you had consulted Brown Todd & Heyburn was because you needed to change the zoning, correct?
>
> A. *That's one of the many things, yes sir. We had to deal with building permits, on-site septic systems, water, electricity, all the other utilities that would be servicing the site.*
>
> Q. *So you had to line up those things, right?*
>
> A. *Yes sir.*
>
> Q. And you were going to make an application to the Oldham County Planning and Zoning Commission for a change in the zoning of that tract if you purchased it, correct?
>
> A. Most likely, yes sir.

Notably, all of the conditions that Pollitt discussed with his lawyers immediately before drafting and executing FDCK's acceptance on the bottom of Martin Marietta's letter offer to sell dated September 7 had been incorporated into FDCK's original offer to purchase the property which expired on August 24 of 1988. It was to this two-page interlineated standard Louisville Board of Realtors form, absent a copy of the accompanying $1,000 earnest money check, that Pollitt *physically attached*[6] his

---

**6.** Pollitt testified on direct examination as follows:

> Q. Mr. Pollitt, would you look at this document previously marked as Plaintiff's Exhibit 6 and tell us what that is. I will hand a copy to the Court of the first page of that document, and we will explain what the other

two pages are if you would describe the document.

> A. This is the counter offer which we received from Martin–Marietta [dated September 7, 1988]; and at the bottom is the acceptance of that counter offer by First Develop-

"acceptance" of Martin Marietta's September 7 offer to sell the property. The attached three pages with a $20,000 check were delivered to Gilmour at 4:15 p.m. on September 22.

█ The physical attachment of the three pages to constitute a single document, without further explanation constituted a conditional acceptance—a counteroffer. Although afforded the opportunity, plaintiff advanced no meaningful explanation or reason for physically combining the three pages into a single document.

Accordingly, absent a meeting of minds, FDCK's acceptance was conditional and was a counter proposal to Martin Marietta's unconditional offer to sell the riverfront property. The trial court's findings of fact and conclusions of law to the contrary are clearly erroneous.

It is the decision of this court that the trial court's decision is REVERSED and the case is REMANDED with instructions to dissolve the restraining order heretofore issued and to enter judgment not inconsistent with this opinion.

BAILEY BROWN, Senior Circuit Judge, dissenting.

I would affirm the judgment of the district court in this non-jury, diversity case, and, therefore, I respectfully dissent. I disagree with the conclusions of the majority on two controlling issues. The first is the majority's conclusion that "FDCK had not accepted Martin Marietta's offer to sell the riverfront property before it knew through Pollitt that the land was no longer available and had been taken off the market." Majority op. at 623. The second is the majority's conclusion that FDCK's "acceptance was conditional and was a counter proposal to Martin Marietta's unconditional offer to sell the riverfront property." Majority op. at 626. These conclusions are neither compelled by Kentucky law nor supported by the district court's factual findings, which are not clearly erroneous.

The majority holds that, because Pollitt candidly admitted that he was aware of the Harmony Landing option contract before he hand delivered FDCK's acceptance to Gilmour, Martin Marietta's counteroffer to FDCK was effectively revoked prior to FDCK's attempted acceptance. It reaches this conclusion by making factual inferences that were not made by the district court and that fail to find support in the record.

An offer is revoked indirectly if "the offeror takes definite action inconsistent with an intention to enter into the proposed

ment Corporation of Kentucky, myself as President.
Q. And what is the *two-page document that is attached* to Plaintiff's Exhibit 6?
A. This is the original offer that was made to Martin–Marietta by First Development on August 16.
Q. And what is it that those documents are attached together the way they are?
A. Well, this first document of 8/16/88 was the offer that was made by First Development of Kentucky for $300,000, the $1,000 deposit to Martin–Marietta for this property, and signed by First Development, myself. This document is a counter offer.
(The $1,000 deposit check alluded to in the above answer was not attached to or included in the envelope delivered to Gilmour on September 22.)

    \*    \*    \*    \*    \*    \*

(Plaintiff's counsel)
MR. McCALL: Your Honor, we move the admission of Plaintiff's Exhibit 6, which has been described by the witness.
THE COURT: If there is no objection, that will be admitted.

Court reporter's note indicated that Plaintiff's Exhibit 6 included: The counter offer from Martin–Marietta with the acceptance by First Development Corporation on the bottom with a two-page original offer attached was received into evidence as Plaintiff's Exhibit Number 6.
On cross-examination by Mr. Zimmerman, Pollitt testified further.
MR. ZIMMERMAN: On the envelope, Your Honor, at the top where it says, Mr. Dale Ahern (phonetic spelling) and at the bottom where it says, received, 4:15 p.m.
BY MR. ZIMMERMAN:
Q. Now is this a copy of the check [the $20,000 check] that was delivered?
A. Yes sir.
Q. Is this a copy of the Martin–Marietta document, which you signed [referring to the Martin Marietta letter offer dated September 7, 1988]?
A. Yes sir.
Q. *And attached to that was this [two-page interlineated] Louisville Board of Realtors, Inc. standard real estate contract form, correct?*
A. *Yes sir.*

contract and the offeree acquires reliable information to that effect." *Restatement (Second) of Contracts* § 43 (1981). Gilmour's disclosure provided Pollitt with information that Martin Marietta had entered into only an *option* contract with Harmony Landing. This information does not constitute definite action inconsistent with an intention to enter into the proposed contract with FDCK. Under Kentucky law, an option contract is not a sale of the property, nor even a binding contract to sell, but only a right to exercise a privilege therein defined. *See Central Bank & Trust Co. v. Kincaid,* 617 S.W.2d 32, 33 (Ky.1981).

FDCK, through Pollitt, did not know what rights the option contract granted to Harmony Landing; it knew only of the option contract's existence. The option might have been subject to FDCK's rejection of Martin Marietta's outstanding counteroffer. "Even a binding contract with a third person may be expressly subject to any rights arising under the outstanding offer." *Restatement (Second) of Contracts* § 43 comment d (1981). If a binding contract with a third person may be subject to any rights arising under an outstanding counteroffer, *a fortiori,* an option contract with a third person may be subject to any rights under an outstanding counteroffer. The district court's conclusion that notice of the existence of the option contract with Harmony Landing did not constitute notice of revocation of Martin Marietta's counteroffer to FDCK is correct. The majority's reversal of the district court on this issue, based on its unstated inference that FDCK knew that the option to Harmony Landing was unconditional, is neither compelled by Kentucky law [1] nor supported by the facts of this case.

I also disagree with the majority's final conclusion: that FDCK's acceptance was ineffective because the attachment of the Louisville Board of Realtors form transmogrified the otherwise unequivocal and unconditional acceptance into a mere counteroffer.[2] The district court found that "Pollitt's acceptance of the counteroffer was unconditional. [The acceptance] says simply 'the above counteroffer is accepted this 21st day of September, 1988,' and is signed by Pollitt in his capacity as President of First Development."

Gilmour testified that, during his September 22 conversation with Pollitt, he asked Pollitt if the terms and conditions in the Louisville Board of Realtors form were intended to be part of the contract. Gilmour testified that Pollitt indicated that they were so intended. The district court, however, did not believe Gilmour's version of the conversation. Given the district court's decision to discredit Gilmour's testimony regarding the attachment of FDCK's original offer to its acceptance of Martin Marietta's counteroffer, and the majority's decision to avoid any credibility assessments, *see* Majority op. at 621, we are left with the unequivocal acceptance written on the face of Martin Marietta's counteroffer, the attached copy of the Louisville Board of Realtors form, and Martin Marietta's bald contention that the inclusion of the Louisville Board of Realtors form was an attempt to vary the terms of the counteroffer. In the light of the district court's finding and the unequivocal terms of the acceptance, I am unable to conclude that the district court erred.

There are several reasons for FDCK's attachment of the Louisville Board of Realtors form that are consistent with an acceptance of Martin Marietta's counteroffer. First, Martin Marietta's counteroffer to FDCK expressly refers to the Louisville Board of Realtors form, which contains FDCK's original offer. Next, without ref-

---

**1.** It should be noted that the majority is unable to cite Kentucky case law supporting the conclusion that, as a matter of law, notice of the existence of the option contract with Harmony Landing constituted notice of revocation of the offer.

**2.** Given its previous conclusion that Martin Marietta revoked its offer before FDCK accept-

ed, the majority's discussion of this issue is unnecessary to its ultimate decision of this case. If, as the majority holds, Martin Marietta effectively revoked before FDCK accepted, then no contract could exist even if the majority agreed that FDCK's acceptance were unequivocal and unconditional.

erence to FDCK's original offer, Martin Marietta's counteroffer does not adequately describe the property that is the subject of the counteroffer. Additionally, FDCK's original offer is the only document that reflects the $1,000 good-faith deposit that FDCK had previously delivered to Martin Marietta. Finally, FDCK's original offer, on the Louisville Board of Realtors form, contained a $300,000 price term that is irreconcilable with the price term in Martin Marietta's counteroffer. There is, therefore, no way sensibly to construe FDCK's acceptance of Martin Marietta's counteroffer as anything but an unconditional acceptance of the counteroffer.

Because FDCK accepted Martin Marietta's counteroffer before Martin Marietta revoked it and because FDCK effectively accepted the counteroffer, I would AFFIRM the decision of the district court and REMAND this case for further proceedings consistent with this dissent.